UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

   Plaintiff,

v.                    Case No. 24-CR-00008

MOHAMMED KAZIM ALI,

   Defendant.

---

**United States of America's Sentencing Memorandum**

---

   Defendant opened a clinical laboratory in Milwaukee in 2017. His lab, Noah Associates, initially lacked clients and was not making money. Defendant found a solution. Defendant (and his business partner and co-defendant, Justin Hanson) paid kickbacks to the owner of a substance use disorder treatment clinic in exchange for referrals of urine drug tests that Noah Associates billed to Medicaid and Medicare. Defendant's kickback scheme made him a lot of money, but the catch was that it was illegal. Defendant, moreover, knew it was illegal. Indeed, Defendant signed agreements with Medicaid and Medicare in which he agreed to comply with the Anti-Kickback Statute and other healthcare fraud laws. Defendant also concealed the kickback scheme, including through the execution of sham agreements to make the kickback payments appear legitimate when, in fact, they were not.

   Defendant's kickback scheme was not some regulatory gray area. Defendant paid the clinic's owner, Gregory Owens, over $400,000 in kickbacks for referrals of urine drug tests and, in turn, his lab received over $2.2 million from Medicaid and Medicaid for those tests. This is exactly the type of conduct that the Anti-Kickback Statute makes criminal. And this case shows why Congress made the payment of healthcare kickbacks a crime. The urine drug tests procured

by the kickbacks were not ordered by any medical professional and were not medically necessary. In short, Defendant's scheme caused Medicaid and Medicare to pay his lab over $2.2 million for testing that patients did not need.

Defendant's theft of millions of dollars from Medicaid and Medicare, however, does not tell the entire story of his crime. Defendant also used without authorization a doctor's credentials to further the scheme. Specifically, some of the urine drug tests at issue were purportedly ordered by Dr. Syed Hasnain. PSR ¶ 29. Dr. Hasnain did not actually order any of tests or provide treatment to the patients for whom the tests were ordered. *Id.* Dr. Hasnain eventually learned that tests were being ordered under his name, and Dr. Hasnain told Defendant to stop. *Id.* Rather than stop, Noah Associates continued to perform and bill the government for tests falsely ordered in Dr. Hasnain's name for months. *Id.* Defendant, in essence, stole a doctor's identity to feed his greed.

And there is no doubt that Defendant engaged in his kickback scheme because of greed. Defendant is a wealthy businessman with a substantial net worth and a healthy family life. There is nothing in his history or circumstances to suggest he committed his crime because of a sense of necessity, or a lack of education, or due to an addiction. The only explanation for Defendant's crime is greed.

The Sentencing Guidelines provide for a sentence of 46 to 57 months' imprisonment. PSR ¶ 80. In the plea agreement, the United States agreed to recommend a sentence no greater than 30 months' imprisonment. *See* ECF 19, ¶ 22. In light of the significant financial harm suffered by Medicaid and Medicare, Defendant's misuse of a doctor's identity, his efforts to conceal his crime, and the scope and length of the kickback conspiracy, the United States

2

Case 2:24-cr-00008-JPS    Filed 01/17/25    Page 2 of 11    Document 35

recommends that the Court impose a sentence of 30 months' imprisonment, a three-year period of supervised release, and a fine of $100,000.

I.      **The Section 3553(a) Factors Support the Government's Recommended Sentence.**

Section 3553(a) provides that the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the familiar purposes of federal sentencing. The United States submits that several of the Section 3553(a) factors support the imposition of a 30-month term of imprisonment and $100,000 fine, including the nature and seriousness of the offense, the need for the sentence to afford adequate deterrence, and the need to promote respect for the law. *See* 18 U.S.C. § 3553(a)(1) & (2). At the same time, however, the United States' recommended sentence falls below the Guidelines' range in light of the mitigating factors present in this matter, including Defendant's lack of a criminal history, his positive family, work, and charitable histories, and his acceptance of responsibility for (and efforts to ameliorate the effects of) his crime.

   A.   **The Nature and Seriousness of the Offense**

Defendant committed a serious offense. As described below, Defendant was one of the organizers of a multi-year kickback conspiracy that cost Medicaid and Medicare over $2.2 million. Defendant, moreover, intentionally committed his crimes, even going so far as to force others to sign sham agreements and to misuse a doctor's identity to further the scheme.

As the Presentence Report correctly concluded, *see* PSR ¶ 41, Defendant was an organizer and leader of the kickback scheme. Despite not being a medical professional, Defendant was the majority owner of Noah Associates and in charge of marketing the laboratory. *See* PSR ¶ 12. In 2017, Noah Associates was not generating much, if any, revenue. *Id.* at ¶ 15. To solve this problem, Defendant contacted Gregory Owens, the owner of a substance abuse

3

treatment clinic called GRO Family Services ("GRO"), and offered to pay Owens kickbacks in exchange for referrals of urine drug tests.[1] Specifically, Defendant took Owens out to dinner, told Owens that GRO needed money to fix its facility, and offered to "help." *Id.* Defendant later introduced Owens to Hanson at Noah Associates' laboratory and again stated that they could "help" GRO, which Owens understood to mean pay him money. *Id.* Hanson then offered to pay Owens $18 per urine sample that GRO sent to Noah for testing and proposed that the payments would be made through Owens' wife, Jacqueline Owens (nee Turner). *Id.* Owens agreed to the arrangement. *Id.*

After Defendant, Hanson, and Owens agreed to the kickback scheme, Defendant later met Mrs. Owens at Noah Associates' laboratory and had her signed several sham agreements (all with her maiden name, Turner). PSR ¶ 18. First, Defendant had Mrs. Owens sign a "Sales and Distribution Agreement" and a "Sales and Distribution Fraud and Abuse Policy." *Id.* These documents falsely stated that Mrs. Owens would market the laboratory's services in exchange for commissions. *Id.* They also falsely stated that "no commissions will be paid on any samples that are reimbursed by a federal insurance carrier." *Id.* Defendant also had Mrs. Owens sign a document titled "Anti-Kickback Statute, Avoiding Compliance Pitfalls: The Anti-Kickback Statute," and this document explicitly discussed the Anti-Kickback Statute's prohibition on payments to induce the referrals. *Id.* Mrs. Owens, however, never performed any marketing services for Noah Associates. *Id.* Defendant (and Hanson) instead simply paid her $18 for each urine sample sent to Noah Associates for testing, including for tests paid by Medicaid or Medicare, in violation of the Anti-Kickback Statute. *Id.* Indeed, Defendant personally wrote

---

[1] Owens pleaded guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 for his role in the kickback scheme. *See United States v. Gregory Owens*, 24-CR-65 (E.D.Wis.). Owens also cooperated against his co-conspirators and substantially assisted the government's prosecution of Defendant and Hanson. Judge Adelman sentenced Owens to term of three years of probation.

4

dozens of checks for the kickback payments worth tens of thousands of dollars, and he consistently wrote false memo lines on the checks stating that they were for "marketing" to hide the purpose of the payments. *Id.* ¶ 20.

These facts demonstrate that Defendant was the moving force behind the kickback arrangement with Owens and took acts to conceal it, notwithstanding his knowledge of the criminal prohibitions of the Anti-Kickback Statute. Defendant's knowledge of, and lack of respect for, the criminal prohibitions of the Anti-Kickback Statute is confirmed by his execution of provided agreements on behalf of Noah Associates with Medicaid and Medicare in which he agreed to comply with that statute. PSR ¶ 12. Defendant thus broke his promises to the government to comply with the law in order to satisfy his greed.

Defendant's broken promises caused Medicaid and Medicare to suffer significant financial losses. These programs paid Defendant's business over $2.2 million for urine drug tests that were not ordered by any physician and were not medically necessary for patients. PSR ¶¶ 32-33 (Medicaid paid over $1.9 million for tests procured by the kickbacks and Medicare paid over $325,000 for such tests); ¶¶ 29-31 (explaining that the tests were purportedly ordered by doctors who, in fact, were not involved in treatment of the patients and did not order the tests and further explaining that, when asked about the medical need for the tests, the doctors stated that they were not medically indicated). Defendant's offense thus goes to the very heart of the reason Congress made the payment of healthcare kickbacks a crime: The "Anti-Kickback Statute is designed to prevent Medicare and Medicaid fraud" by preventing "abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services." *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015).

5

The financial losses suffered by Medicare and Medicaid are not only significant in amount—again, over $2.2 million—but also because the Medicare and Medicaid programs benefit some of the most vulnerable in our community. Medicare provides medical coverage primarily for the elderly, and Medicaid provides medical coverage primarily for the impoverished. Given the seemingly ever-increasing costs of medical care and perennial concerns about funding for Medicare and Medicaid, Defendant's kickback schemes, in a very real sense, stole funds from these vulnerable groups to line his pockets.

The scope of Defendant's kickback scheme is also noteworthy. The scheme lasted three years, starting in the fall of 2017 and continuing until the government served subpoenas on Noah Associates in the fall of 2020. The scheme, moreover, grew to include hundreds of patients not only at GRO, but another substance abuse disorder clinic called the Jesse Crawford Recovery Center ("JCRC"). Indeed, Defendant offered to pay JCRC's owner for each urine sample sent to Noah Associates for testing, but JCRC's owner turned down that offer because he knew it was illegal. PSR ¶ 14. At Hanson's behest, however, Owens later convinced JCRC's owner to start sending urine samples to Noah Associates for testing. Defendant (and Hanson) thereafter paid Owens kickbacks for each sample that Owens arranged for JCRC to send to Noah Associates for testing. *Id.* at ¶ 17. And in a further attempt to conceal the kickback payments to Owens for referrals from GRO and JCRC, Defendant and Hanson eventually stopped making the payments to Owens' wife and instead made them to another woman, Jazmine Johnson, who, in turn, passed the money on to Owens. ¶¶ 21-28. Defendant personally wrote checks for these kickback payments, including the check at issue in his count of conviction. *Id.* ¶ 25.

Finally, the seriousness of Defendant's crime is underlined by his willingness to misuse a doctor's credentials and abuse the trust of vulnerable patients. Government healthcare programs

will only pay for urine drug tests that are ordered by a physician or other licensed medical provided. PSR ¶ 29. For the kickback scheme to work, therefore, the urine samples sent to Noah Associates for testing needed to be accompanied by physician orders. As explained, Defendant knew that some of the urine drug tests procured by the kickbacks were submitted with orders purportedly signed by Dr. Syed Hasnain.[2] *Id.* As Defendant also knew—because Dr. Hasnain told him—Dr. Hasnain was not actually involved in the care of the patients and did not actually order the tests. *Id.* Even though Dr. Hasnain told Defendant to stop accepting orders purportedly issued in his name, Noah Associates continued to accept the orders and bill the government for tests. *Id.* And for all of the urine tests procured by the kickbacks, Defendant's scheme relied on the fact that the patients had histories of substance abuse and addiction. Government healthcare programs, understandably, cover the cost of addiction treatment. Defendant took advantage of this fact and used these vulnerable patients (and their government health insurance) to line his pockets.

        **B.**       **The Need for Deterrence and Promotion of Respect for the Law**

Defendant committed a serious, white-collar offense. Defendant thus committed precisely the type of crime that calls out for a period of incarceration and a hefty fine in order to promote deterrence and respect for the law.

Indeed, the Seventh Circuit has repeatedly "endorsed the idea that white-collar criminals 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)). In this District, the court has also recognized that the concept of "general deterrence may be more of a factor in white collar

---

[2] Dr. Hasnain was later charged with improper distribution of controlled substances and healthcare fraud for misconduct unrelated to the matters at issue in this case. *See United States v. Hasnain et al.*, 23-cr-063. Dr. Hasnain died before his criminal case was resolved, and the government dismissed the charges against him.

7

cases, where at least some of the people tempted to commit such crimes are rational actors who would be dissuaded by the prospect of prison." *United States v. Goss*, 325 F. Supp. 3d 932, 935 (E.D. Wis. 2018).

To ensure that Defendant and others similarly situated are deterred from future healthcare fraud offenses, the Court should impose a term of imprisonment. Only a prison term will show potential offenders that the risks of engaging in healthcare fraud outweigh the potential financial rewards. Indeed, in a similar healthcare kickback case, this Court sentenced two defendants, David Guerrero and Alex Shister, to 32- and 18-months' imprisonment, respectively. *See United States v. Guerrero & Shister*, 20-cr-148-JPS (E.D. Wis). The government's recommended sentence in this case thus not only ensures that Defendant and others similarly situated will understand that healthcare fraud will not be tolerated, but further ensures consistent sentences are imposed across like cases. *See* 18 U.S.C. § 3553(a)(6).

Likewise, a $100,000 fine—the statutory maximum—is also necessary. Defendant and his co-defendant, Hanson, agreed to pay full restitution to Medicaid and Medicare, and in light of their joint and several liability for restitution, each has already tendered half of the government's loss to the Court. The government commends Defendant for his payment of restitution, which signals that he accepts responsibility for his crime and has attempted to mitigate its financial impact. But if the only financial consequence of his crime is repayment of the amount he stole, years after he stole it, Defendant will receive a windfall that shows that crime can pay. Without a fine, Defendant will have received, in effect, a no-interest loan from the government, and a sophisticated businessman like the Defendant surely used the improper payments he received from the Medicaid and Medicare to fund investments or other ventures, making even more money. Indeed, Defendant personally received over $800,000 from Noah Associates during the

8

kickback conspiracy—far more than his co-defendant, Hanson, *see* PSR ¶ 41—and the proceeds of the scheme likely help explain Defendant's current net worth of at least $4.5 million.[3]

### C. Defendant's History and Characteristics

Despite the seriousness of Defendant's offense, the United States recommends a below-Guidelines term of imprisonment of 30 months. The government's recommendation balances the aggravating factors of his offense with the (partially) mitigating factors of Defendant's history and characteristics.

Defendant falls into criminal history category I because he lacked a substantial criminal history before his offense in this case. The government notes, however, that Defendant's criminal history is understated because he was able to get away with his kickback conspiracy for three years. We now know that Defendant was committing crimes—violations of the Anti-Kickback Act, conspiracy, and potentially identity theft—during a years' long scheme. Defendant's willingness to commit these crimes for years shows that, notwithstanding his prior lack of a record, he poses a risk of recidivism.

Defendant also has a history of family support. Defendant's status as a supportive father and husband are certainly laudable. Defendant contends that a noncustodial sentence is necessary to allow him to care for his wife, who suffers from long-standing medical issues. The government notes, however, that Defendant and his wife currently live alone, without assistance, and that they have more than sufficient financial resources to obtain assistance for his wife if needed, should the Court sentence Defendant to a term of imprisonment. One of their sons,

---

[3] The PSR calculates Defendant's net worth to be approximately $4.5 million (even after paying over $1 million in restitution). *See* PSR ¶ 76. The government questions whether Defendant's financial disclosure was complete, however, because he also appears to own, through holding companies, several additional rental properties. *See* Addendum to PSR, Government's Objection to Paragraph 88. Defendant's financial disclosures also do not account for the remaining assets of Noah Associates, such as medical equipment, which Defendant previously represented were worth approximately $1 million. *Id.*

9

Case 2:24-cr-00008-JPS   Filed 01/17/25   Page 9 of 11   Document 35

moreover, lives in the Milwaukee area and is a physician, suggesting that Defendant's wife could likely obtain her son's assistance with her care if needed.

Defendant also operated several successful businesses that have made him a wealthy man. His success in multiple businesses shows that he has been and can be a productive member of society. Defendant also apparently has put his wealth to charitable use, as he reportedly operates a charitable organization in his native country of India. The government has accounted for these mitigating factors in its sentencing recommendation. For example, Defendant has lived in the United States since the 1970s and, therefore, has not directly operated his charity in India at any time. Although a term of imprisonment may complicate his ability to oversee his charity from the United States, it will not change the fundamental fact that other individuals have been and can continue to run the charity on a day-to-day basis.

Most importantly, the mitigating factors presented by Defendant's positive family, employment, and charitable histories cannot completely excuse his crimes. To the contrary, many defendants appear for sentencing in this Court, point to troubling histories, and argue that they had no choice but to commit their crimes. Even defendants in white-collar cases often make such arguments. *See, e.g., United States v. Dikiara*, 50 F. Supp. 3d 1029, 1031-32 (E.D. Wis. 2014). Defendant cannot even attempt to make such an argument here. Instead, the clear explanation for his crime is greed. The Court should impose a custodial sentence that shows crimes of greed will not be excused.

## II. Conclusion

Defendant's kickback scheme lasted for years, involved hundreds of patients, and caused Medicaid and Medicare to suffer losses exceeding $2 million. Defendant, moreover, knew well that he was violating the law. He also knew that he was misusing a doctor's credentials to

perform and bill the government for unnecessary tests. Defendant had no trouble breaking the law and the trust of his patients to satisfy his greed. But the Defendant also accepted responsibility for his crime, has taken steps to ameliorate it, and lived a laudable life prior to his crime. In light of all of these facts, the United States recommends that the Court sentence Defendant to 30 months' imprisonment, a three-year term of supervised release, and a fine of $100,000.

Dated at Milwaukee, Wisconsin, this 17th day of January, 2025.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By: /s Michael Carter
Michael Carter
Assistant United States Attorney
State Bar No. 1090041
Eastern District of Wisconsin
517 E. Wisconsin Ave., Suite 530
Milwaukee, Wisconsin 53202
Tel: (414) 297-4101
Email: michael.a.carter@usdoj.gov